## Commonwealth *v.* Jennings, Appellant.

Submitted September 10, 1973. Before WRIGHT, P. J., WATKINS, JACOBS, HOFFMAN, SPAULDING, CERCONE, and SPAETH, JJ.

*Marvin R. Halbert,* for appellant.

*John H. Isom* and *David Richman,* Assistant District Attorneys, *Richard A. Sprague,* First Assistant

District Attorney, and *Arlen Specter,* District Attorney, for Commonwealth, appellee.

OPINION BY CERCONE, J., November 16, 1973:

On the night of April 14-15, 1972, two opposing groups of boys from two Philadelphia communities gathered on opposite banks of Wissahickon Creek awaiting the opening of trout season. Name calling, rock throwing and sporadic small fights inevitably led to a massive retaliatory attack by the group to which the appellant Jennings belonged. During the assault one youth, Gerald Clemson, was beaten and stabbed several times. While no one could positively identify Jennings as being directly involved in the beating and stabbing of Clemson, he was identified as having chased the victim across the creek immediately thereafter while brandishing a weapon[1] and shouting, "If you want more, come back."

During the trial the appellant called one Thomas Vecchione who had been present on the night in question, and who was to be the principal defense witness.[2] Before the witness entered the courtroom, the assistant district attorney informed the court that there was an unexecuted complaint outstanding against the witness and that if he testified "he (would) no doubt incriminate himself." The assistant district attorney then advised the court that whether an arrest warrant would issue depended in large part on whether the witness testified. The Commonwealth admitted that it was only charging Vecchione with being a participant in the general assault, a role which twenty to thirty other

---

[1] Some witnesses said the weapon was a knife, although there was testimony that it was a club.

[2] The appellant's brief indicates that had Vecchione testified he would have given evidence tending to prove that Jennings did not participate in the assault upon Clemson and did not know that Clemson was stabbed when he chased him.

youths had also played, and for which no one had been prosecuted theretofore. Thus, virtually every exculpatory witness that the appellant could call was susceptible to a similar threat. When Vecchione entered the courtroom he was apprised of the complaint and its implications. The discourse between the district attorney and the court led Vecchione to state on the stand that he was "intimidated" and "scared of" the prosecutor. The court advised Vecchione to confer with an attorney during a recess period. After a noon conference with a member of the public defender's office, Vecchione went home and did not return to court. Out of consideration for Vecchione's plight, the appellant expressly declined the court's offer to issue a bench warrant to procure Vecchione's return.

The events which occurred at trial surrounding the circumstances and significance of the criminal complaint against Vecchione led the trial judge to express some rather harsh words for the assistant district attorney: "Frankly I have never had this experience before, either. I don't think I have ever seen a more blatant abuse of the criminal process than what occurred here this morning. I am really shocked. . . . Threatening with an arrest. In my many years as a Judge and seven years as a prosecutor myself, and—I have never had an experience like this. . . . I want to turn this tactic. . . . I am going to have the notes transcribed. I will refer it to the proper authority. . . . This is outrageous."

The appellant argues that the actions of the prosecutor constituted a denial of the appellant's Fourteenth Amendment rights to due process and a fair trial. We agree. The district attorney contends that his remarks were meant solely as a matter of protection for Vecchione against testimony which might incriminate him.

*Pyle v. Kansas*, 317 U.S. 213 (1942), established that abuse by the state of its prosecutorial prerogative could

constitute a denial of due process for an accused when the threats of prosecution are directed at potential witnesses for the defense. The threats were considered to be constitutionally improper attempts to suppress evidence favorable to the accused.

The landmark decision of *Brady v. Maryland*[3] delineated the guidelines for determining whether the state has unconstitutionally suppressed evidence, and concluded: "We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where *the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution.*"[4] Thus, the question posed by the instant appeal is whether the prosecutor's conduct constituted a suppression of evidence within the intendment of *Pyle* and *Brady*. We are of the opinion that it did. It has been established that the requisite warnings may not be given in a fashion which exert "such" duress on the witness' mind as to preclude him from making a free and voluntary choice whether or not to testify." *Webb v. Texas*, 409 U.S. 100, 93 S. Ct. 331, 34 L. Ed. 330 (1972). The existence of the complaint charging witness Vecchione with a crime, the manner of its introduction into the discussion between the district attorney and the court and the remarks of the district attorney could have had no other effect on witness Vecchione except to convince him that the price of his testimony was his arrest regardless of the nature of his testimony. While the facts in *Webb* differ from those herein insofar as the objectionable warnings were very strenuous admonitions against perjury given by the trial judge himself, the rationale applies equally to the instant case. One need only note the outrage of the trial judge and the self-

---

[3] 373 U.S. 83 (1963). See also *Com. v. Powell*, 449 Pa. 126 (1972).

[4] *Id.* at 87 (Emphasis added).

expressed fear of the young witness to reach the conclusion that the constitutionally-forbidden duress was present here. As *Brady* makes clear, it does not matter that the prosecutor's intentions were good, or that the testimony of the witness would only have mitigated the defendant's guilt; it only matters that the Assistant District's Attorney's improper conduct intimidated the witness and resulted in his refusal to testify. As the trial judge noted, it is the court's function to advise a witness of his rights against self-incrimination when it feels the witness is about to give such testimony. However, when the prosecutor gives the warning while brandishing the complaint, the witness will likely conclude, as the witness in the instant case obviously did, that he will be prosecuted because he gave evidence which undermined the Commonwealth's case. As the *Webb* decision states, the accused is entitled to protection from the state's abuse of its prosecutorial machinery which tends to "effectively drive the witness off the stand."

Finally the Commonwealth makes the novel argument that it is somehow compelled by *Escobedo v. Illinois*, 378 U.S. 478 (1964) to give such warnings since the investigation had focused on the witness. This may be true, but *Escobedo* cannot be read to mean that warnings when given to a witness can be permitted to carry with them such serious threats against the witness' interests as to render him incapable of making a free and untrammeled decision as to whether he should testify or not.

And finally this unfortunate occurrence in the process of the trial did not constitute harmless error. Vecchione's testimony, as apparently agreed upon by both the district attorney and the appellant, could very well have so weighed in favor of the defendant as to result in a *verdict* favorable to defendant, or at least a lighter sentence.

494

The decision of the lower court denying appellant's motion for a new trial is hereby reversed, and the cause remanded for a new trial.

WRIGHT, P. J., and WATKINS, J., would affirm the judgment of the court below.